# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Criminal Action Number** |
| ) | **06-00072-01-CR-W-FJG** |
| Robert A. Blaylock, ) | |
| ) | |
| Defendant. ) | |

## Report and Recommendation

Pending before the Court is Defendant Robert A. Blaylock's motion to suppress statements and evidence filed on September 29, 2006 (Doc. #33). On October 17, 2006, the undersigned held an evidentiary hearing on the defendant's motion. Defendant Blaylock was present and was represented by his counsel, George A. Wheeler. The government was represented by Assistant United States Attorneys Paul S. Becker and Jess E. Michaelsen. At the evidentiary hearing, the United States called Anthony Mak, Ricky Ropka, Joseph Daneff and Greg Pelter of the Kansas City, Missouri Police Department as witnesses. Defendant Blaylock called Curtis Ray Taylor, Marilynne Bills, Anita Howard as witnesses and also testified on his own behalf. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
|---|---|
| Govt. #1. | Search warrant application; |
| Govt. #2. | Search warrant; |
| Govt. #4. | videotape arrest scene; |

1

| | |
|---|---|
| Govt. #6. | report of 8/30/04 narcotics purchase; |
| Govt. #7. | report of 9/8/04 narcotics purchase; |
| Govt. #9. | photograph of defendant; |
| Govt. #10. | photograph of defendant; |
| Govt. #11. | *Miranda* waiver; |
| Govt. #12. | report of interview; |
| Deft. #1. | statement of Curtis R. Taylor; |
| Deft. #2. | statement of Marilynne Bills; |
| Deft #3. | statement of Anita Howard; and |
| Deft. #4. | set of 28 photographs. |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. On August 30, 2004, Officer Ropka was working as an undercover narcotics officer in the area of 13th and Fremont in Kansas City, Missouri. (Tr. 13) In his undercover capacity, Ropka approached an individual later identified as defendant Blaylock sitting on the front porch of the residence at 1301 Fremont. (Tr. 14) During the course of a conversation between the two, Blaylock agreed to sell $20 worth of crack cocaine to Ropka. (Tr. 15) Blaylock walked to a blue Nissan (license # 882-WGK) parked in front of the residence, entered the vehicle and then returned to Ropka who handed him $20 in pre-recorded "buy money" in exchange for one piece of a beige rock-like substance wrapped in plastic. (Tr. 15-16) The substance later field-tested positive for the presence of crack cocaine. (Tr. 15)

2. At the conclusion of the transaction, Blaylock gave Ropka a cell phone number to call him for future purchases and told Ropka that although he lived down south, he would come to Ropka since Ropka did not have a vehicle. (Tr. 17)

3. A check of the license plate for the blue Nissan from which Blaylock retrieved the narcotics revealed the vehicle was registered to Robert Blaylock and Marilyn King, 7339 Wabash, Kansas City, Missouri. (Tr. 17)

4. Ropka prepared a buy report describing the above transaction the day after the transaction. (Govt. Ex. #6, Tr. 16)

5. On September 8, 2004, after confirming that the blue Nissan used in the August 30th transaction was parked in the driveway at 7339 Wabash, Ropka called Blaylock's cell phone number and spoke with Blaylock to arrange another transaction. (Tr. 17-18, 26-27)

2

6. Blaylock agreed to another transaction and told Ropka to meet him at the Family Dollar at 75th and Prospect. (Tr. 18) Ropka traveled to the Family Dollar at 75th and Prospect and waited for Blaylock in the parking lot. (Tr. 18)

7. A surveillance team watched as two females exited the residence at 7339 Wabash and drove the same blue Nissan directly to the Family Dollar at 75th and Prospect (Tr. 18) After determining that Ropka was the individual who called Blaylock's cell phone, one of the females (later identified as Marilyn King) instructed Ropka to get into the blue Nissan where she sold two pieces of purported crack cocaine to Ropka for $40.00. Ropka asked King where Blaylock was and was told that he was "back in the house playing cards with his boys, so he sent [her]." (Tr. 20) Ropka exited the vehicle, got back into his undercover vehicle and drove away with the narcotics. (Tr. 20, 31)

8. The surveillance team surveilled the two females in the blue Nissan return to 7339 Wabash. (Tr. 22, 31) The substance later field-tested positive for cocaine. (Tr. 20)

9. Ropka prepared a buy report describing the September 8th transaction shortly after the transaction occurred. (Govt. Ex. #7, Tr. 20)

10. Based upon the above information, Ropka also prepared an affidavit in support of an application for a search warrant for 7339 Wabash, Kansas City, Missouri (Govt. Ex #1, Tr. 22) Due to his undercover status, Ropka provided the information and affidavit/application to Sergeant Mak who presented it to Judge Gillis of the Jackson County Circuit Court. (Tr. 23, 28-29) Judge Gillis issued a search warrant for 7339 Wabash at 8:45 a.m. on September 10, 2004. (Govt. Ex. #2)

11. On September 16, 2004, the Tactical Enforcement Unit was briefed in preparation for the execution of the search warrant for 7339 Wabash. The search team was provided with a description of the residence at 7339 Wabash, a description of the blue Nissan, the names of the sellers, the type of narcotics sold, copies of the buy money, the serial numbers of the buy money, and the buy reports prepared by Ropka for the August 30th and September 8th transactions. (Tr. 24, 32-33, 35-36)

12. On September 16, 2004, at approximately 11:50 a.m., the tactical squad arrived at 7339 Wabash to execute the search warrant. (Tr. 36) As the tactical squad prepared to forcibly enter the residence if necessary, Blaylock opened the door. (Tr. 37, 115) The tactical squad entered the residence and placed Blaylock face down on the living room floor and cuffed him. (Tr. 38) The tactical squad then secured and searched the residence.

13. The blue Nissan parked in the driveway of 7339 Wabash was also searched. (Tr. 38) The vehicle was not listed on the search warrant for 7339 Wabash (Tr. 46,

3

Govt. Ex. #2) There were no exigent circumstances regarding the Nissan and the search was not an inventory search prior to towing the vehicle. (Tr. 46) During the course of the search of the blue Nissan, officers recovered crack cocaine from the center console area and a 9 millimeter semi-automatic pistol from the trunk. (Tr. 39)

14. At some point during the course of the search of the residence, Blaylock was taken from the living room outside to the front porch of the residence. (Tr. 38) Curtis Ray Taylor and Anita Howard testified at the evidentiary hearing they were present on the street at the time Blaylock was sitting on the front porch and that Blaylock was excited and yelled at them many times to call his mother. Taylor and Howard testified that the police officers told Blaylock to shut up, slapped him in the back of his head with the palms of their hands, kicked him and drug him back inside the residence. (Tr. 71-79, 101-102, 106-107, Def. Ex. #1, Def. Ex. #2)

15. After the search and his arrest on September 16, 2004, Blaylock was transported to police headquarters and booked. (Tr. 52) After the booking process, he was placed in the detention unit on the 8th floor of police headquarters. (Tr. 53).

16. The next morning, September 17th, at approximately 8:00 a.m., Detective Greg Pelter took Blaylock to an interview room on the 2nd floor of police headquarters to interview him. (Tr. 53-54) Pelter filled out the *Miranda Waiver* form (Govt. Ex. #11) and told Blaylock to read it aloud. (Tr. 55, 59-60) Pelter asked Blaylock if he understood his rights and told Blaylock that, if he understood his rights, to sign by the "X" indicating that he understood his rights. Pelter told Blaylock that he did not have to say anything. (Tr. 55) Blaylock signed the *Miranda Waiver* form. Pelter then questioned Blaylock and subsequently prepared a report of the interview reflecting the information Blaylock told him during the course of the questioning. (Tr. 55, 57-58, Govt. Ex. #12) The interview began at 8:16 a.m. and concluded at 9:30 a.m. (Tr. 55) Blaylock was then released from custody at 9:30 a.m. on September 17, 2004. (Tr. 138)

17. At the time of the interview, Pelter did not see any bruises on Blaylock's face. (Tr. 63) Pelter does not recall that Blaylock requested medical attention nor any other indication that Blaylock was injured. (Tr. 63-64).

18. Blaylock testified at the evidentiary hearing that although he signed the *Miranda Waiver* form, he did not agree to give Pelter a statement. (Tr. 111) Blaylock testified he signed the form because Pelter told him that if he signed the form he would go to a hospital. (Tr. 112, 119, 124-125) Blaylock testified that he did not provide any of the information in Govt. Ex. #12 to Pelter. (Tr. 113, 120-121, 126-131)

4

19. Blaylock testified that during the transport to the police station, he told officers that he needed to go to the hospital but was refused. He further testified that when he arrived at the police station he again requested to be taken to the hospital and was again refused. He testified that he was eventually taken to Truman Medical Center but only after Alvin Brooks was contacted. He testified that the following day he was interviewed by Pelter and released from the police station. (Tr. 22-125)

20. Marilynne Bills testified at the evidentiary hearing that Blaylock came to her home sometime after he was released from jail on September 17, 2006. Bills testified that Blaylock was beaten, bruised and scratched and that she took pictures of Blaylock's physical condition as well as the condition of his home and clothing. (Tr. 82-99, Deft. Ex. #4)

## PROPOSED CONCLUSIONS OF LAW

Blaylock has filed with the Court a three-part motion to suppress. First, Blaylock seeks to suppress any and all statements made by him (either written or oral) because such statement was involuntarily obtained. Second, Blaylock seeks to suppress the fruits of the search conducted at 7337 Wabash because the underlying warrant was obtained through a false affidavit. Finally, Blaylock seeks to suppress the evidence obtained through the warrantless search of the blue Nissan. The Court will briefly address each concern in turn.

## 1. The voluntariness of Blaylock's statements.

Blaylock argues that any statements he made to law enforcement were involuntary inasmuch as "he was physically, emotionally and mentally abused while in police custody." MOTION TO SUPPRESS, at 4. The keystone to the admissibility of a defendant's statements to law enforcement is voluntariness. In determining whether a confession is voluntary, a reviewing court considers the totality of the circumstances. *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988). To establish that his confession was involuntary, Blaylock had the burden to show that his statements were the product of police coercion and his "will [was] overborne and his capacity for

5

self-determination critically impaired." *Id.* (*quoting Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879 (1961)).

In reviewing the totality of the circumstances in this case, the Court concludes that Blaylock has not established that his statement given to Detective Pelter the day after Blaylock's arrest was not voluntary. Blaylock was advised of his *Miranda* rights and signed a written waiver form. Moreover, although Blaylock presented some limited evidence of aggressive police conduct at the scene of the search, the Court does not find the conduct to have reached the level to throw into question a statement made Blaylock approximately nineteen hours later.[1]

## 2. The sufficiency of the affidavit supporting the search warrant.

Blaylock argues that the search of the Wabash residence was improper because the search warrant was obtained through the use of a false affidavit. However, Blaylock does identify any portion of the supporting affidavit that is false and only specifically asserts that Blaylock "was not named in any of the evidence presented to the Judge to support the issuance of the search warrant." MOTION TO SUPPRESS, at 5. Blaylock properly notes that while a search warrant is presumed to be valid, an affidavit in support of a search warrant violates the Fourth Amendment if it contains "allegations of deliberate falsehood or of reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). However,

---

[1] In reaching this conclusion, the Court has been required to make some credibility determinations, particularly as they pertain to Blaylock's recitation of the facts and circumstances surrounding his statement to Detective Pelter as compared to Detective Pelter's testimony regarding the elicitation of the statement. In making such determinations, the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. In the end, the Court concluded that Detective Pelter was a more credible witness regarding the September 17th statement.

6

> To prove a *Franks* violation, defendant must show: "(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and (2) that with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.

*United States v. Amburn*, 412 F.3d 909, 917 (8th Cir. 2005) (*citations omitted*). In this case, Blaylock has failed to satisfy the first requirement of *Franks*, to wit: establishing that a false statement was included in the affidavit.

### 3. The warrantless search of the blue Nissan.

Finally, Blaylock asserts that the warrantless search of the blue Nissan was improper since "it was not listed in the Affidavit, it was not being operated and the police officer had no authority to conduct an inventory check of said vehicle." MOTION TO SUPPRESS, at 5. Blaylock is correct when he states that the blue Nissan was not covered by the Affidavit or ensuing search warrant. Moreover, the government does not seek to justify the search of the blue Nissan as an inventory search incident to an arrest. Finally, Blaylock is correct that the vehicle was not being operated at, or immediately, prior to the search. However, the latter fact does not prohibit law enforcement officers from conducting valid warrantless searches of motor vehicles. The Eighth Circuit decision in *United States v. Fladten*, 230 F.3d 1083 (8th Cir. 2000) is instructive.

In *Fladten*, law enforcement officers executed a search warrant on a residence based upon probable cause to believe that the manufacture of methamphetamine was occurring in the residence. After completing the search of the residence, an officer peered in the window of a grey Buick parked in the driveway of the house. The officer saw a "reflux condenser glass tube" (an item associated with the manufacture of methamphetamine) in the back seat. Thereafter, officers searched the vehicle, finding contraband in the trunk.

7

The defendant moved to suppress the search of the vehicle, arguing "that the district court should have excluded the evidence gained from the warrantless search of the automobile." *Id*. at 1085. The Eighth Circuit, however, concluded that the search of the vehicle was valid under the "automobile exception." The Court noted:

> As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception. Probable cause exists when, given the totality of circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular case.

*Id*. (*citing Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) *and Illinois v. Gates*, 462 U.S. 213, 238 (1983)).[2]

Analyzing the facts in *Fladten*, the Eighth Circuit concluded that the officers at the scene of the search of the residence had probable cause to conduct a warrantless search of the grey Buick. The court noted that:

(1) The automobile was parked in the driveway of a house where officers had just found evidence of drug-related activity, and

(2) An item commonly used in the manufacture of methamphetamine was in plain view in the back of the automobile.

---

[2] The automobile exception was originally founded on an automobile's "ready mobility" which created a potential exigent circumstance regarding the loss or destruction of evidence. *See*, *e.g.*, *California v. Carney*, 471 U.S. 386, 390-91(1985). More recent cases have broadened the justification for the automobile exception to encompass "the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulations." *Labron*, 518 U.S. at 940.

8

*Id*. at 1086. Viewing the totality of the circumstances, the court found that these two facts "provided a substantial basis for the conclusion that further contraband or evidence may have been in other parts of the automobile." *Id*.

As in *Fadten*, the blue Nissan in this case was parked in the driveway of a residence where evidence of illegal activities had been discovered. While there was no plain view of items in the blue Nissan (as occurred in *Fladten*), in this case, officers at the scene were aware that the blue Nissan had been utilized in two separate undercover drug sales to transport the illegal narcotics, and that, in one of the illegal sales, the drugs were hidden inside the vehicle. Analogizing to *Fladten*, the Court finds that the law enforcement officers had probable cause to search the blue Nissan and, pursuant to the automobile exception, could conduct a search of the blue Nissan without a warrant.

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** Defendant Blaylock's motion to suppress evidence and statements, filed September 29, 2006, (Doc. No. 33).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                              */s/ John T. Maughmer*
                                              **John T. Maughmer**
                                          **United States Magistrate Judge**